We'll move to case number four, Martin Jaranowski v. Indiana Harbor Belt Railroad Company. That's appeal number 22-2437. And we'll hear from Mr. Bruges. I apologize if I mispronounced that. When you're ready. May it please the court, counsel. My name is George Bruges. I represent injured railroad employees, and this is a Federal Employers Liability Act case. Just a little history. You know, railroad employees don't get workers' comp, state workers' comp benefits. So the way they get compensation for work-related injuries is through the FLA. The FLA was passed in 1907 because, and this is from McBride, which is a United States Supreme Court case that affirmed the Seventh Circuit issue on causation recently. 10,000 railroad employees were killed the year before the FLA was passed, and over 300,000 were hurt, and this was on an annual basis. So the issues that we're here dealing with, these safety issues, are really very important both for railroad employees and for the public at large. After the passage of the FLA, those numbers came way down, and the FLA has worked to make railroads much safer for the employees and for the public. It's still a dangerous job. Marty Geronowski, 53 years old, worked at the railroad for over 20 years. He works not as a conductor, like on the metro trains, but works in freight yards. So he's climbing up and down the side of cars, riding on the side of cars, setting handbrakes, throwing switches. In the railroad industry, you know, what they say is that inches mean the difference between life and death. It's a very dangerous job. One of the most important things is the taking care of switches because switches, as Mr. Blackwell said, are a primary contributor to employee injuries and also a primary contributor to derailments, the car's derailment, when the railroad doesn't properly inspect and maintain their switches. So the regulations that we're dealing with are very important. We're here because the magistrate judge gave summary judgment to the railroad, so there are some important factual issues here. What happened is Mr. Geronowski's injury was depicted on video, and I've attached the video both in the district court and here, that shows him operating the switch. The switch malfunctions, and he goes down until his engineer comes and calls the ambulance for him. The railroad goes out and does some inspection right afterwards, and it's really, you know, the best evidence that we have, or some of the best evidence we have, that they knew or should have known of these regulatory violations in this MA-27 switch. There's a federal regulation in the Federal Track Safety Standards about vegetation, and as Marty Geronowski said in his deposition, there's two trees growing in the ballast between the switch points. So, Mr. Burgess, I've been struggling to try to understand what you think the defect is, because we've got, as I understand it, evidence about missing cotter pins and extra movement, the lost movement of the switch handle. Is the vegetation, how is the vegetation relevant? In particular, as I understand it, the force needed to operate this switch, when the railroad checked it right after Mr. Janikowski's injury, went as high as 126 pounds, right? Yes. And then they did some lubrication, and things are back within normal scope. That doesn't sound like a vegetation problem. So, the court in the Steele case went into that extensively, and Mr. Blackwell's report, which I know is real long, went into that extensively. The ballast is the rocks that they use to support the track structure, and the ballast is supposed to drain water, and in this case, the ballast was fouled with dirt and other organic material to the extent that it was full of dirt and it was not draining water, which lets the vegetation grow. And so when you don't have the ballast properly supporting the track, that can contribute, as Mr. Blackwell explained, to the switch points binding up. And just as a factual matter, by the time they lubricate, the railroad had already cleaned up the tracks, right? That was that three-man, 40-minute cleanup. Am I correct about that?  So, what happened is we got the case, we filed it, we did a request to go out there and inspect the switch with my expert, Mr. Blackwell. And the day before Mr. Blackwell was out there, and this is just because we subpoenaed the videotape, we never would have known this, but the railroad, in anticipation of my expert going out to document the deficiencies in the switch, had a three-man crew work on that switch for 40 minutes, clean all the vegetation out, clean the ballast out, and lubricate the thing to the extent that there was grease oozing out of the switch stand after they had done. So that cleanup was done in anticipation of my expert going out there to look at the switch. And, I mean, it skewed the fact record in this, except to the extent that when Mr. Blackwell went out there and did his inspection, there still were missing cotter pins that caused the sluice pins, the points were still skewed, and it still had excessive lost motion. So I did the math, and what they're moving, those switch points, are 16 1⁄2 feet long, and they weigh 136 pounds per 3 feet of rail. So if my math is right, that's about 1,496 pounds of rail that Mr. Jaranowski is moving, and the reason that he can move it is because it acts as a lever. The points move a couple inches, and the switch handle with some gears inside is going to move a few feet. But it still took, when the railroad went out there and inspected it, way beyond the safe lifting requirements, it was 126 pounds. So when Blackwell went out there, he saw that you pick up the switch handle, and the points weren't moving. So what that does is, and that's consistent with Mr. Ritter's inspection where it went from. You're talking about what happened, your inspection a year after the accident? Yes, but they're consistent. Okay, can I ask you a couple of quick questions, more Mr. Burgess? You tell us in page 40 of your brief that Blackwell says the conditions of the switch as depicted in the day of the accident photographs are not consistent with competent switch inspections. I didn't see that in the cited source. Could you help me out on that? It's in his opinion on the very last page of his original report. Do you want me to grab it? The last page. I could grab it if. Please. I was looking at the cited page six and around there. Okay. Okay. So it's actually appendix 18, and it'd be paragraph 14. Blackwell's opinions are set forth in his report and include they failed to maintain it, so it was operable, failed to control and remove dirt. Sorry, I'm looking at what you cited in your brief. You want me to look at something else? I'm sorry. I may have had a mis-cite. Yes, appendix in my brief. Okay. A18. Okay. And paragraph 14. Pages 17 to 18. Okay. So you want to cite pages 17 to 18 of that document? Yes, sir. All right. Thank you. Sorry. We don't know the case as well as you do. Also, so the defense emphasizes that the plaintiff himself operated the same switch four days earlier. If it was defective, how could he have missed that? Your response? Yes, so this is what they call a non-repeatable defect. It just depends upon whether the points are moving properly as he operates it, and sometimes when you catch the switch handle just right, the points will move properly. But clearly, even when Mr. Ritter went out there, the IHB engineer, and inspected it right after Geronowski was hurt, it wasn't operating properly on that day at that time he was hurt, and Mr. Blackwell attributes the failure to operate properly was that 11 days prior, the railroad, when they ostensibly did their inspection, didn't see the problems with the ballast that were obvious. They didn't see the problems with the missing and loose bolts, missing cotter pins, and they didn't operate the switch to determine whether there was lost motion. Okay. Thanks. So a jury may say that the switch should have looked like it did after they did their inspection, Judge, the day before Mr. Blackwell did his inspection, where everything was clean and everything was oiled and, you know, it looked nice. And it couldn't have looked like that, and then 11 days later, looked like it did with vegetation growing and the foul ballast and the switch not operating right. Mr. Brogues, one question. How does the condition of the ballast impact how the switch operates? Okay. So, and I cite the Steele case. The judge has a long explanation in that. But because everything is being supported, and that's what I cite the ballast regulation, is the purpose of the ballast is to support the switch. When the ballast is improper, that will cause the switch points not to move in the right plane, not to move properly. And they have a limited amount of time. You may finish your answer to Judge Lee. Okay. So it goes into some detail in the Steele case of how the ballast can affect it. But if I could say one more thing, Judge. And we'll give you your rebuttal time, Mr. Brogues. Thank you, Judge. Okay. All right. Mr. Talbert, and I apologize if I mispronounce it. You got it right, Your Honor. I have two points to make, one legal, the other factual. I'll begin with the legal point. Contrary to what Mr. Jaranowski said in his reply brief, it is not the law. It is not the law that a FELA plaintiff avoids summary judgment whenever he or she presents any evidence of notice, no matter how slight. Like any other plaintiff alleging negligence, a FELA plaintiff must prove duty, breach, causation, and damages. In this court's 2007 decision in Coffey v. Northeast Illinois Regional Commuter Railroad, this court expressly held that, and expressly held given the text of 45 U.S.C. Section 51, that a plaintiff's reduced evidentiary burden is reduced only as to the causation element, not to any of the other elements. Thus, a FELA plaintiff must still present sufficient evidence of duty and breach and damages. Because notice is an element of duty, here in this case, Mr. Jaranowski must present sufficient evidence of notice. As this court has recognized following the United States Supreme Court's decision in Anderson v. Liberty Lobby, it is not sufficient to avoid summary judgment to present merely colorable or not significantly dispositive evidence. Right. So, Mr. Tauber, let me ask you about the test of the switch by your guy immediately after the accident. Yes, Your Honor. It takes 126 pounds of force to move the switch. That is incorrect, Your Honor. Well, what did he find? Mr. Bruges is conflating pounds, something that you lift straight up from the earth, and torque pounds. The 126 measurement is foot pounds. That measures the torque. Okay, 126 foot pounds of force. That's still way more than it's supposed to be, right? No, not at all, Your Honor. Because he went in and then lubricated it and brought those forces, the foot pounds of force, back down in the 30 to 50 range, right? That's incorrect, Your Honor. It is not the case that it was operating outside of the parameters. The parameters that Mr. Bruges points to are taken from NIOSH and some case for, I think, a different railroad, none of which is in the record and none of which applies here. The parameters for the proper operation of the switch are on the very card, the inspection report from 1026. They're at the very top. And I think I can give you the citation specifically, Your Honor. I know it's in the opening brief. I'm sorry. I should have had it at my fingertip. But I'll find that, or if I don't, I can get the court the citation that's maybe within the reply brief. But I'll get the citation for you, Your Honor. But the report that shows the 126 foot pound measurement at the very top of that very page gives the proper and actual parameters for the operation of that switch. And you will see that the proper range goes from 105 foot pounds to 144 foot pounds. So 126 lies well within the proper range for the operation of the switch. Moreover, Mr. Bruges simply misstated the record when he asserted that Mr. Ritter testified that the switch was not operating properly upon his inspection after the accident. Mr. Ritter testified the exact opposite. Mr. Ritter testified that the switch was operating properly. His only thing that he said about the switch looking at the photos was that, yeah, I'd have had them clean up that water bottle and paper cup. He testified that the switch was operating properly. Mr. Bruges misstated the record when he suggested otherwise. Now, could you address this cleanup of the switch just before their expert came to see it? Your Honor, I simply don't know why it was done. But in any event, it's irrelevant to the question of notice. The question is not what was the condition. No, but it has something to do with the litigation. And it certainly sounds pretty fishy. Again, Your Honor, I simply don't have any explanation to give you. But the question here is whether the railroad was on notice as of October 26, 2020, not whether the switch was cleaned on July 15, 2021. And understand that, you know, there are 140,000 miles of railroad in this country, almost all of which is outside. Little weeds are going to grow. Railroad tracks are not putting greens. And the FRA does not insist that we maintain them as if they were putting greens. There will be some leaves. There will be some vegetation. And it's not that you have to keep the railroad tracks pristine, as Mr. Jaranowski claims. Rather, you have to make sure that they operate properly. And they were operating properly here. Now, there is no evidence that IHB had actual knowledge of the alleged defect. The evidence shows quite to the contrary that there were no reports of any problems with the switch from the time it was installed through the day of the accident. Mr. Jaranowski did not complain of it, despite having used the switch on numerous occasions. None of his coworkers complained about the switch. And the inspection records show that it was inspected regularly as required by the FRA. Mr. Jaranowski's argument rests on the assertion that IHB had constructive knowledge of the alleged defects. But he did not present sufficient evidence that we, in fact, had constructive knowledge. Mr. Talbert, what exactly does a railroad do when they inspect a switch? What do they look for? It looks for a variety of things. We'll look for any obstructive vegetation. Here, we just have a couple of small weeds. It was not trees. Were there trees actually there? That would be a problem, and the inspector would note that and have it cleaned up. The inspector will check to make sure that the rails are parallel, as they're supposed to be. The rep will actually throw the switch during our monthly inspections. Our inspectors will operate each and every switch that they inspect, as this one. They will check to make sure that there is no need for excessive force to operate the switch. They will check the fastenings to make sure that they are proper. Given that, what do we make of Mr. Blackwell's observations when he looked at this switch about missing cotter pins and the so-called lost motion? Yes, Your Honor. I'll start with the cotter pin, Your Honor. If you look at the photographs taken on October 26, the day of the accident, they do, in fact, show one cotter pin missing. That's true. But the fact that there was a cotter pin missing on October 26 says absolutely nothing about whether a cotter pin was missing at the previous inspection on October 15. Cotter pins come out all the time. That's part of the reason why you're looking for them. The vibrations of the tracks means that cotter pins come loose. So the fact that there happened to be a cotter pin missing on October 26 doesn't tell us whether we had notice of a defect on October 15. Moreover, precisely because the loss of a single cotter pin is not an urgent matter, if you look at 49 CFR Section 9B, you will see that railroads have 30 days from discovery of such a defect to correct it. So even if, not the case, but even if there were evidence that we knew about the missing cotter pin on October 15, it still would not be a violation of the regulation for at least another 30 days because we have a full 30-day period in which to replace it. You definitely have an answer for everything, Mr. Talbert, but it still strikes me that a real question here is whether the jury ought to be hearing these questions and answers and not the court. Let me take you back to another question and answer you had with Judge Hamilton about this torque force. You know, Mr. Jaranowski responds, sure, the railroad argues this was within the manufacturer's window, which is in fact what you repeated to us right now, but it exceeds OSHA's requirements and it exceeds the lifting requirements for conductor's job description, which would have been 85 foot-pounds, and OSHA is at 51 foot-pounds. But they're not, if I may correct you, they're not foot-pounds. This is where the problem comes in. Pounds. The OSHA regulation, which I don't think applies here, and this case where you just pull something from another railroad, are speaking in lifting weight, so a force straight up. That's a pound. You're lifting the weight, whereas with the foot-pounds measuring torque, what you're doing is simply measuring the force it takes to move a lever one foot with one pound of energy, and that then describes the motion at the center of the rod that's being turned. And so because, as Mr. Perugia says, it's a lever, you cannot compare foot-pounds, which is leverage, to just lifting one pound. They're just completely separate measurements. One has nothing to do with the other. So the observation that the switch in one of the three measurements registered a downward motion of 120. Remember, that's downward levered motion of 126 foot-pounds, tells you nothing at all about, or does not suggest that it's out of any spec because the two specs that Mr. Perugia points to, Mr. Jaranowski points to, are in feet, not foot-pounds, and they are not applicable here. They're just not applicable. There's no evidence to suggest that either the OSHA standard or this other railroad standard apply to this switch, and indeed the switch shows that it was within proper tolerances. But frankly, Your Honor, even if, I mean, Mr. Blackwell, Mr. Jaranowski's argument with respect to constructive notice rests entirely on Mr. Blackwell's report. Mr. Blackwell's report says, I looked at photographs from October 26th, and I see defects there. Even accepting that is true, and we certainly have quibbles about whether or not they're not quibbles. We contest vigorously that there are no defects. But even if we assume that there are defects visible on the photographs from October 26th, that does not establish that we had notice of those defects on October 15th. All right. Thank you, Mr. Taber. And Mr. Bruges, we will give you two minutes. So I guess the first issue and the important issue is, what does the law say? Because there certainly is a long line of cases starting in the 1940s from the United States Supreme Court that have been cited by this court over and over that say that the quantum of evidence in a FELA case that survives summary judgment is significantly less than in a common law case, and that a FELA plaintiff with any evidence of notice or negligence of any of the elements survives summary judgment, because a right to a jury trial is an integral part of the statute, and that's decades and decades of uncontested precedent in the FELA area. And so that's, I guess, what you're going to have to decide, whether the way I said the law and the cases I cited are correct or that it's a similar standard to any other case. But even under a normal case, there was significant evidence. And what I would point the court to is Judge Radovich saying that arguably plaintiff has evidence of notice based upon the vegetation violations in the photographs taken the day of Mr. Geronowski's injury. To answer Judge Lee's question, what does the track inspector look for? He looks for violation of the Federal Track Safety Standards, 49 CFR Part 213, which the photographs show and Mr. Blackwell's subsequent inspections show significant violations. So, you know, the second part that we really didn't address is whether notice is even necessary in a violation of a regulation under Kernan and Walden and Schmitz and all those cases that have never addressed this issue. You know, I don't think the Federal Railroad Administration changed, you know, decades and decades of FELA jurisprudence by that small Federal Register blurb that they're relying upon. And if you look at that, they had to do a federalism analysis as part of that notice of proposed rulemaking that specifically said there's not going to be any change by this notice of proposed rulemaking to federal law. So we would ask your honors to please give Mr. Geronowski his day in court for the railroad's violation of the FELA. All right. Okay. Thank you to both of the parties in the case.